# Callender's Administrator *versus* The Keystone Mutual Life Insurance Company.

1. Where an executor or administrator prosecutes a claim of the estate in good faith and fails, he is not personally liable to the defendant for his costs.

2. A general judgment against an administrator plaintiff for costs is a judgment against the estate only, and an execution issued thereon against him personally is erroneous.

3. The case of Ewing *v.* Furness, 1 *Harris* 531, overruled, and the doctrine of *stare decisis* considered and explained.

ERROR to the Common Pleas of *Dauphin county.*

This was an action of covenant by Daniel Hartman, administrator of the estate of W. Callender, deceased, on a policy of insurance, issued by the defendants on the life of the plaintiff's intestate, in which he was defeated on the ground of misrepresentations made by the deceased, and judgment was entered in favor of the defendant: see 9 *Harris* 466. On this judgment the defendant issued a *fi. fa.* against the plaintiff for the costs to be levied *de bonis propriis,* and on motion, the Court below refused to set it aside, and hence this writ of error.

*Fisher,* for the plaintiff in error.—It was admitted that the case of Ewing *v.* Furness sustained the decision below, but insisted that that case is without any support in the cases from which it is supposed to be derived: 11 *Ser. & R.* 247; 2 *Rawle* 180; 8 *W. & Ser.* 379; 7 *Barr* 136; 5 *Pa. Law Jour.* 511.

*Berryhill,* contrà, relied especially on Ewing *v.* Furness and the other cases reviewed by the plaintiff.

[Callender's Administrator *v.* Keystone Mutual Life Insurance Co.]

The opinion of the Court was delivered by

LOWRIE, J.—This case presents the question, Is an administrator plaintiff personally liable to execution for the general costs of the cause, on a verdict and general judgment in favor of the defendant?

This question was decided in the affirmative in the Court below, and so it was decided in this Court in 1850, in the case of Ewing *v.* Furness, 13 *State Rep.* 531, without anything having been said by the Court in vindication of the decision, except that it was " on the authority of several decisions of this Court, directly in point."

We have failed to find any such cases, and none are cited before us, as supposed, to contain such a doctrine, except Show *v.* Conway, 7 *State Rep.* 136 ; Muntorf *v.* Muntorf, 2 *Rawle* 180 ; Penrose *v.* Pawling, 8 *W. & Ser.* 380 ; and these seem to be those alluded to by the Court, and we shall look for the rule there.

It is not in Muntorf *v.* Muntorf, for that refers to and approves the case of Musser *v.* Good, 11 *Ser. & R.* 247, which expressly negatives our present question, and decides only that our rule is different from the English one in this, that the latter gives no costs at all in such cases, while ours gives costs against the assets, and not against the administrator personally.

It is not in Penrose *v.* Pawling, for that decides only that an administrator plaintiff, who received his costs paid by the defendant on an appeal from an award, is personally liable for the costs thus received, if he be finally defeated in the action ; and this admits that he is not personally liable for the costs generally. What he had personally received as his costs, to which he was conditionally entitled, he must personally refund on the failure of the condition, to wit : on losing the final judgment. This puts the parties in the final judgment, personally, in the same relative condition that they were in before the suit began, and is equivalent to judgment against the assets for the general costs of the defendant. Such is also the case of McWilliams *v.* Hopkins, 1 *Whart.* 275.

The case of Show *v.* Conway professes to be founded, in part, on the two just considered, and therefore it is not inconsistent with them, though the syllabus of it is. The defendant did not recover his costs from the administrator in that case by virtue of the judgment, but under a special decree, founded on testimony specially taken, and showing that the suit was vexatious, and for this reason the decree was affirmed here. This, therefore, is merely the affirmance of another principle of law that makes an administrator plaintiff liable for costs when he is defeated in a wanton and vexatious suit : 7 *Wend.* 552 ; 1 *Denio* 276 ; 3 *Bos. & Pul.* 115 ; 5 *Id.* 72 ; 9 *Bing.* 754. And hereby our question is implicitly, yet plainly negatived, notwithstanding some loose expressions that seem to cover a broader principle than was demanded by the case.

We find, therefore, no support for Ewing *v.* Furness, and every-

[Callender's Administrator v. Keystone Mutual Life Insurance Co.]

thing against it. And there are other evidences of the law still more abundant and convincing. The old English statutes, giving costs against plaintiffs, have always been construed not to apply as against executors and administrators; and subject to the modification above alluded to, we have followed the law as we got it there. The statute 3 Jac. 1, c. 8, requires bail in error for debt and costs; but this is held not to apply to administrators, plaintiffs in error, because they are not personally liable for either debt or costs: Cro. Jac. 350; 4 Mod. 245. And such, and for the same reason, is the construction of the terms of appeal from an award under our Act of 1810: 5 Binn. 400; and from Nisi Prius, 2 State Rep. 404.

The English decisions afterwards received the sanction of stat. 16 and 17 Car. 2, c. 8, s. 5, which, in requiring bail in error, excepts the case of executors and administrators. And this statute was in force with us until superseded by our more recent statutes to the same effect in the cases of writs of error and appeals of every kind from courts, awards, justices of the peace, and under the Act of 1846, concerning bail and attachment.

But the denial of the principle of Ewing v. Furness is much more direct and positive in the statutes that forbid justices of the peace to enter judgment or issue execution against administrators personally (Act of 1810), or that execution issue against them at all where there is a deficiency of assets, and requires that the remedy shall proceed in the Orphans' Court against the estate of the decedent: Act of 1834, concerning executors and administrators. With us, therefore, a general judgment against administrators, whether plaintiffs or defendants, is always against them officially, and to be paid by them out of the assets, and not personally. And such being the judgment, such must be the execution.

Nobody has ever supposed that on a general judgment against a defendant administrator, who has unsuccessfully resisted a claim against the estate, he is personally liable for the costs; and we can see no essential difference in this regard between an unsuccessful prosecution and an unsuccessful resistance of a claim.

Besides this, it is some evidence of what the law is with us, that our sister states, deriving their customs and modes of thinking from the same source, have the same rule, or the old English one; and so we find it in New York, 7 Wend. 522, 4 Cow. 87; New Jersey, 1 Harrison 210; South Carolina, 2 Ray 165, 1 Bailey 79; North Carolina, 1 Murphy 102; Georgia, Dudley 1; Kentucky, 2 Littell 387, 2 J. J. Marsh 499; Illinois, 3 Scam. 61; Alabama, 7 Alab. 251, 10 Id. 600; and in Ohio by statute. In Massachusetts it is altered by statute.

Surely such an amount of evidence is sufficient to show what the law is, and to satisfy any reasonable man that there is good reason

for it, and that the decision in Ewing *v.* Furness is a mistake, and ought not to be followed.

Do we violate the doctrine of *stare decisis* by now correcting the mistake, and going back to the well established doctrine which that case has disturbed? If we do, we commit a greater error than the one we have felt bound to correct; for that doctrine, though incapable of being expressed by any sharp and rigid definition, and therefore incapable of becoming an institute of positive law, is among the most important principles of good government. But, like all such principles, in its ideal it presents its medial and its extreme aspects, and is approximately defined by the negation of its extremes.

The conservatism that would make the instance of to-day the rule of to-morrow, and thus cast society in the rigid moulds of positive law, in order to get rid of the embarrassing but wholesome diversities of thought and practice that belong to free, rational, and imperfect beings; and the radicalism that, in ignorance of the laws of human progress and disregard of the rights of others, would lightly esteem all official precedents and general customs that are not measured by its own idiosyncrasies; each of these extremes always tends to be converted into the other, and both stand rebuked in every volume of our jurisprudence.

And the medial aspect of the doctrine stands everywhere revealed as the only practical one. Not as an arbitrary rule of positive law, attributing to the mere memory of cases higher honor and greater value than belong to the science and natural instinct and common feeling of right; not as withholding allowance for official fallibility, and for the changing views, pursuits, and customs that are caused by, and that indicate an advancing civilization; not as indurating, and thus deadening the forms that give expression to the living spirit; not as enforcing "the traditions of the elders," when they "make void the law" in its true sense; nor as fixing all opinions that have ever been pronounced by official functionaries; but as yielding to them the respect which their official character demands, and which all good education enjoins.

When the varied surface of this earth is changed into a dead level, and the ocean's waves are still, then man will need another habitation. And when the variety of human action and development is subjected to judicial and legislative prescriptions, and the rule of man's free and educated reason is proscribed, with all its improving diversities, and all reasoning becomes illegal, if the subject has been already reasoned upon by judges or decided upon by them without reasoning, then man will need another jurisprudence, and another legislation, without, perhaps, being capable of enjoying them.

The doctrine of *stare decisis* is, indeed, one of the most important in the law; for in its simplicity it expresses man's reverence

[Callender's Administrator *v.* Keystone Mutual Life Insurance Co.]

for civil authority, and the demand of his nature that it shall be obeyed—and this feeling is the surest foundation of social order. It is the expression of the people's expectation that all government shall be administered with great care and with a reasonable degree of consistency, and of their confidence that it is so ; and it involves the injunction that official functionaries shall not for light reasons abandon the expressed judgments of themselves or of their predecessors, especially if any serious embarrassment of public order may be the consequence.   It regards all governmental, and especially judicial decisions, as the official representations of the public will in relation to civil rights and duties, and as being entitled to respect and reverence for this simple reason.   To these feelings and principles we owe official reverence, and we desire to cherish it as a necessary element of social order and of judicial character.

We do not violate it when we declare that a decision made four years ago in opposition to all previous legislation and jurisprudence, is open to correction.   We should violate it by declaring that decision to be conclusive evidence of the law, and should at the same time announce a judicial heresy, involving the assertion that judicial decisions are equivalent to positive law, and that Courts not only apply the law, but make it.   And how palpable would appear the violation, when it should be noticed that the case which we establish is without any and against all precedent!

If it should be said that the principle of the decision in Ewing *v.* Furness has entered into the customs and practice of the country, then the claim that it should stand as law would be founded upon a different principle, expressed in the maxim *communis error facit jus.*   If such a custom has arisen in this instance, it has had but a short life, and secured but a frail title to perpetuity.   And surely the fact that subordinate Courts and officers may have been misled by the decision in some unknown instances in the application of the law, can have no influence in converting the error into a rule of right.   Official customs affect not usually rights themselves, but the means of securing them.

The case of Ewing *v.* Furness must be regarded as a divergence from the beaten path of the law, and we cannot help to clear a new track in that direction.   It is a plain error, and it is not our duty to set the stain that mischance has dropped upon the law. The case before us, having followed its lead, must be reversed. The judgment is against the estate of the decedent, and so must the execution be.

> September 13, 1854.   This cause came on to be heard at the late term of this Court, at Harrisburg, on a writ of error to the Court of Common Pleas of Dauphin county, and was argued by counsel, and now, on mature deliberation, it is considered and adjudged, that there is error in the execution, in that the same issued

against the plaintiff, to be levied out of his own effects, when it ought to have been in the form directed by law against the assets in his hands as administrator; and therefore the said execution is set aside at the costs of the defendants in error, and the cause is remanded to the said Court of Common Pleas.

BLACK, C. J., and KNOX, J., dissented.